No. 31,511

Claude Hamilton, *Plaintiff* (Lillian Hills Hamilton substituted for Annette Richards, Trustee in Bankruptcy, *Appellant*), v. R. W. Talbot, C. B. Talbot, A. G. Hazlett, The Center Oil Company, The McCullough Oil Company, and The American National Company (now The American-First Trust Company in Oklahoma City, Oklahoma), *Appellees*.

(34 P. 2d 553.)

Opinion filed July 7, 1934.

*W. L. Huggins* and *L. W. Raynolds,* both of Emporia, for the appellant.

*W. W. Parker,* of Emporia, *Lee G. Gill* and *A. W. Gilliland,* both of Oklahoma City, Okla., for appellee American-First Trust Company.

*Gilbert Frith* and *C. V. Beck,* both of Emporia, for appellees R. W. Talbot, C. B. Talbot, Center Oil Company and the McCullough Oil Company.

The opinion of the court was delivered by

Harvey, J.: This action was here before (128 Kan. 180, 276 Pac. 808), where the principal facts were stated and need not be repeated. A retrial resulted in findings and a judgment by the court adverse to plaintiff. His motions to set aside these findings and for a new trial were overruled, and he has appealed.

One of the issues in the retrial, as framed by the pleadings, was whether the American National Company (later reorganized as the American-First Trust Company of Oklahoma City, and hereinafter called the "trust company") purchased from plaintiff the note for $10,946.91, executed by R. W. Talbot, C. B. Talbot, A. G. Hazlett, and the Center Oil Company, and payable to the trust company. On this point plaintiff alleged in substance that the trust company purchased this note from him and paid him for it; that plaintiff guaranteed the ultimate payment of the note, that is, that it was agreed between plaintiff and the trust company that the

trust company would look to its mortgage security for payment, but if that should prove inadequate plaintiff would pay the deficiency, and to secure the trust company on that guarantee plaintiff placed with the trust company the proceeds of the note and other moneys so the total was $15,000, to be invested by the trust company for plaintiff in certain classes of securities until it was determined whether plaintiff was liable on his guarantee; that this agreement was first made orally, but later was reduced to writing by correspondence. In the first answer filed by the trust company in this action all of the above allegations made by plaintiff were specifically admitted. Some months later, by leave of court, the trust company filed an amended or substituted answer in which it denied it had purchased the note, and alleged in substance that what it did was done in an effort to accommodate plaintiff and to assist him in collecting the note which at all times belonged to him. While other pleadings were filed, and some of them amended later, the issue tried was who owned the note. Did the trust company purchase it, or simply attempt to aid plaintiff in collecting a note which at all times belonged to him? On this point the evidence on plaintiff's behalf was to this effect: The Talbots and Hazlett were indebted to him. He had sued them in Oklahoma, which action was pending. They told him they had oil properties in Kansas mortgaged to the trust company. Plaintiff went to the trust company—he knew some of its officers, one of them many years—and told them of the status of his business with the Talbots, and inquired if their mortgage to the trust company contained a "blanket clause" securing later indebtedness. The mortgage was examined and found to contain such a clause. He then asked the trust company if it could take this Talbot and Hazlett indebtedness, and offered to guarantee it if the mortgaged property proved insufficient. After some conference among the officers of the trust company they told plaintiff they would take it, but that he would have to get a new note payable direct to the trust company, and further stated that it would be necessary for the trust company to file in Kansas a warning notice that it had purchased the indebtedness. Plaintiff then went to the Talbots and they and Hazlett executed the note in question. Having assigned their interest in the mortgaged property to the Center Oil Company, a corporation which they had organized and the stock of which they owned and of which the Talbots were officers, the note was also executed on behalf of the Center Oil Company. Plaintiff

sent this note to the trust company, with a letter, dated December 7, 1926, the pertinent portion of which reads:

"On reaching Tulsa and interviewing the Talbots, I find that they have transferred their Kansas property to the Center Oil Company, which they own. So without demur they made a note for $10,946.91, for one year, interest at seven per cent from date, payable semiannually.

"This note is also signed by R. W. Talbot, C. B. Talbot and A. G. Hazlett of Okmulgee. He also has an interest separate from the Talbots in this Kansas property.

"It is my desire to sell you this note and have you keep or hold the money in my account or invest in bonds, or something or other, which, of course, is to be held until this note is paid from the proceeds of the Kansas property."

Plaintiff's letter, inclosing the note, was answered December 9, 1926, by the trust company as follows:

". . . We have received your letter of December 7, with which you inclosed the note for $10,946.91, by R. W. Talbot and others in your favor.

"We shall purchase this note in accordance with agreement with you and advise of payment will be sent you later. . . ."

On December 10 the trust company wrote plaintiff:

"We yesterday sent to Emporia, the county seat of Lyon county, Kansas, an affidavit executed by me as vice president of the American National Company, giving notice of the additional indebtedness of Mr. R. W. Talbot and others to us under our previous mortgage of $66,000.

"We have credited you with the proceeds of the note of $10,946.91. We shall either leave the credit that way, or invest the proceeds in bonds or mortgages to be held by us until the $10,946.91 note is fully paid.

"It is understood that we are to account to you for whatever is paid to us on this note, and that the proceeds from the note now held by us are not subject to being withdrawn, and if the proceeds, or any part of them, are invested in bonds or mortgages, the bonds or mortgages are to be held by us. It being the intent, of our special agreement with you, we are attempting to collect the $10,946.91 note for you.

"I am writing this letter and giving information only to you although I am writing Mr. Mossman in answer to his letter of December 8, advising that we have served what we consider to be proper notice by having affidavit recorded in Lyon county, Kansas."

On December 11 plaintiff wrote the trust company:

". . . In reference to the note of $10,946.91 R. W. Talbot and others sold to you, will you kindly send me a memorandum of what securities were purchased for my account to be held by you collateral to my indorsement on this note? I wish to make the proper entries on my books. . . ."

On December 13 the trust company wrote plaintiff as follows:

". . . So far we still have the proceeds of the Talbot note here to your credit. We are having a little trouble picking out some securities that we can

conveniently leave in this account, but I hope to advise you soon of the final disposition of this matter.

"I assume you have already received my letter advising that we sent promptly to Emporia, Kansas, the special notice regarding the Talbot loan for recording."

On the same day plaintiff wrote the trust company:

"DEAR MR. ROBERTS: Your letter of December 10 is received. I am glad to know that the affidavit has been executed and sent forward for record.

"You have been so very nice to me that I am going to venture to suggest that there is something about your letter which I do not feel is exactly correct, although it undoubtedly will mean the same thing.

"In relation to the third paragraph of your letter, I have only to state that my talk with both you and your attorney was on the basis of a sale to you of the note given to me by R. W. and C. B. Talbot. Your attorney suggested that I obtain new notes from them, and the day I was in Tulsa I frankly stated to them my purpose was to sell you this note.

"Of course it was understood that the proceeds of this note was to be held by you in trust, or some other way, until the obligation was liquidated. I now inclose check on the First National Bank of Tulsa for $4,053.09, making the amount of my trust fund $15,000.

"I would like to have this invested in some Oklahoma school or township bonds suitable for trust investments, of as short maturity as possible so that if I wish to later, I can liquidate them at as nearly cost as possible. This entire fund is to be held by you until my guarantee on the note of $10,946.91 is liquidated. . . ."

On December 17 the trust company wrote plaintiff:

"I have received your letter of December 13, also your letter of December 15, with which you inclosed check for $29.25, recording fee and tax on the instrument filed in Kansas.

"I am inclosing herewith brief description of some short-time 6 per cent school and city bonds. We have just purchased these bonds and are getting ready to offer them for sale. They are the kind that sell very quickly here. I will make you the following prices, which are the regular prices at which we sell these to Oklahoma bankers who buy quickly. We do not have complete financial statements on all of them, but you may be assured that they are all right.

"$5,000. Board of education, Fairfax, 6 per cent school-building bonds, due 1929, on a 4.6 per cent interest basis, less ¼ concession.

"$4,000. Board of education, Roff, 6 per cent school-building bonds, due 1929, on a 4.70 per cent interest basis, less ¼ concession.

"$5,000. Haileyville board of education 6 per cent school-building bonds, due August 1, 1927, on a 4.50 per cent interest basis, or about 101 and accrued interest.

"$5,000. City of Cushing 6 per cent waterworks bonds, due 1929, on a 4.70 per cent interest basis, less ¼ concession.

"We are preparing an offering to send to our regular list, including Okla-

homa banks. I am certain these short-time bonds will be snapped up immediately when these offerings go out, which probably will be to-morrow or Monday. We therefore suggest that you wire immediately next Monday, or as soon as you receive this letter, advising whether it is all right to put these into your trust account to be handled as we have agreed.

"I think we understand each other as to the handling of your special account. You have sold us the note with recourse, and the security or the cash which we are holding in trust for you, is to be held as security on this note of which you are in reality an indorser.

"You, of course, will understand that I wrote my letter of December 10 only to you, as I do not want this matter held in any way that there would be any misunderstanding if anything should happen to you or me.

"If any of the bonds described in the list inclosed herewith do not suit you, I can probably fill the order from some small accounts of short-time bonds, mostly rural school-district bonds (at 6 per cent), of which we probably have close to $2,000, in addition to the ones offered you herewith."

On December 20 plaintiff wired the trust company:

"Will take first three issues. Do not care for Cushing."

Later correspondence between the parties makes it clear that the trust company was making and holding these investments for plaintiff under what is spoken of as a "trust fund" or "special account." As interest coupons came due on the bonds the trust company collected the money and remitted it to plaintiff, the bonds were sent to plaintiff at his home in Michigan, to be there listed for purposes of taxation as his bonds, and no question appears to have been raised as to plaintiff's ownership of these securities until many months after this action was brought. In addition to that, on December 10, 1926, the trust company, by C. C. Roberts as vice president, executed an affidavit which recited that the trust company was the holder of the mortgage made by the Talbots April 10, 1926, to secure the sum of $66,000 on certain oil lease holdings in Lyon county, Kansas, which affidavit contained this statement:

"Affiant further states that on December 10, 1926, R. W. Talbot and C. B. Talbot became further indebted to the American National Company, a corporation, of Oklahoma City, mortgagee in the above-described mortgage, in the total sum of ten thousand nine hundred forty-six and 91/100 dollars ($10,946.91), evidenced by a note dated December 9, 1926, due one year after date, payable to the order of the American National Company, with interest at the rate of seven per cent (7%) per annum from date, and signed by R. W. Talbot, C. B. Talbot, and also by the Center Oil Company, and by A. G. Hazlett, and that his declaration is made to the end that said note may be secured by said mortgage as said original indebtedness of sixty-six thousand dollars ($66,000), was by said mortgage secured, and further affiant sayeth not."

This affidavit was sent by the trust company for record to the register of deeds of Lyon county, Kansas, where it was recorded December 11, 1926. The trust company also gave written notice by separate letters, dated December 29, 1926, to R. W. Talbot, C. B. Talbot and A. G. Hazlett as follows:

"Please be notified and keep in mind that the American National Company owns note for $10,946.91, dated December 9, 1926, due December 9, 1927, and bearing 7 per cent interest per annum, on which you are a signer, and you will therefore see that payment is made direct to us and all communications regarding this note sent to us."

The trust company opened an account with plaintiff, sometimes spoken of as a "special account," at other times as a "trust account," in which it credited plaintiff with the amount of this note, $10,946.91, spoken of in the correspondence as the "proceeds" of the note, and also credited him with $4,053.09, which plaintiff sent the trust company to make his account $15,000. In this account plaintiff was charged with the cost of bonds purchased by the trust company for him, and later credited or charged with items growing out of the handling of the investments. These investments in securities and the record kept of them were in all respects the same as though plaintiff had sent $15,000 in cash to the trust company for investment in such securities.

As opposed to this showing on plaintiff's behalf there was the testimony of several of the officials of the trust company to the effect that the trust company never purchased the note at all, nor agreed to do so; that all it attempted to do was to aid plaintiff, who had previously transacted some business with the trust company, and was a good friend for many years of one of its officers, to collect a debt from the Talbots and Hazlett, which he had been unable up to that time to collect, and that the statements contained in the correspondence and other written instruments above mentioned, to the effect that the trust company had purchased the note and was owner of it, were inaccurate and did not state the true agreement between the parties. It should be noted that the trust company does not seek to rescind, or to modify, on the ground of mutual mistake, or on other equitable grounds, a contract by which it purchased the note. Its contention is that it did not purchase and never owned the note. It contends that all it agreed to do was to use its good offices to help plaintiff collect a bad debt, and that what is contained in its correspondence and in the records it

made, or caused to be made, tending to show that it purchased the note were fabrications to deceive, or to assist plaintiff in deceiving, the Talbots. A contention so bold and so unworthy should not have judicial sanction.

Were the evidence, as to what contract was made, made to depend alone upon the testimony of the parties as to the talk or understanding they had on the occasion when plaintiff first talked with the officials of the trust company about the matter, before the note was executed, the court could very well have found for the trust company, for that testimony was conflicting. But the evidence does not depend upon that testimony alone. The letters between the parties and other written evidence must be considered. We are in as good a position to consider those written instruments as was the trial court. (*Palmer v. Johnson,* 132 Kan. 161, 164, 294 Pac. 874.) In plaintiff's letter sending the note to the trust company he said: "It is my desire to sell you this note." In the trust company's reply it said: "We shall purchase this note," and on the next day wrote: "We have credited you with the proceeds of the note." It is true that in the third paragraph of the same letter it was said:

"It is understood that we are to account to you for whatever is paid to us on this note. . . . It being the intent, of our special agreement with you, we are attempting to collect the $10,946.91 note for you."

Plaintiff promptly replied:

"In relation to the third paragraph of your letter, I have only to state that my talk with both you and your attorney was on a basis of a sale to you of the notes. . . ."

The trust company specifically replied to this, saying:

"I think we understand each other as to the handling of your special account. You have sold us the note. . . ."

Considering these writings, it is folly to say the trust company did not purchase this note—it does not make much difference what the preliminary talk about it was, for that is merged in the writings. The way the trust company handled the proceeds of the note for plaintiff, the records it made, the notice it gave the makers, and the affidavit it made and filed in Lyon county, are consistent only with its purchase of the note, if fundamental principles of common honesty are to be given weight.

The trust company pleaded and pressed upon the attention of the trial court, which embodied in its findings and appeared to treat

as controlling, certain sections of the statutes of Oklahoma, which read:

"A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Okla. Stat. 1931, § 9460.)

And—

"However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." (Okla. Stat. 1931, § 9472.)

These are two of many sections of the general statutes of Oklahoma in which the legislature has undertaken to codify the rules of law pertaining to contracts (Okla. Stat. 1931, §§ 9389 to 9655). As so codified they appear not to differ materially from rules of law pertaining to contracts as recognized in this state and other common-law jurisdictions. But a proper application of these sections to the evidence in this case is not helpful to the trust company. Taking the testimony of the trust company officials alone—and on this point evidence on behalf of plaintiff accords with it—"the mutual intention of the parties" from the first was to so handle the indebtedness of the Talbots and Hazlett to plaintiff that it would be secured by the trust company's mortgage by virtue of the "blanket clause" therein. Clearly that was plaintiff's purpose, and it is just as clear such was the purpose of the trust company. That could be accomplished in one way only—by the Talbots becoming indebted to the trust company in the amount they then owed plaintiff. A sham or pretense only on that point would be ineffectual and would defeat the purpose both parties had in mind. The mutual intention of the parties could be accomplished by getting a new note which would be owned by the trust company, and by the trust company taking the proper steps, as by notice to the makers and by their affidavit of record, to have the additional debt to it secured by its mortgage. So, if these statutes have any more force in this case— a question we find it unnecessary to decide—than the applicable rules of law of this state, they are helpful to plaintiff.

The trial court found that the trust company did not purchase the note. Appellant contends there is no evidence to sustain this finding. The point is well taken, and requires a reversal of the case. More than that, we hold, on the written evidence, that the trust company did purchase the note.

.

There is not much else seriously contested in this action. The mortgage given by the Talbots to the trust company on their Kansas property contained a clause by which they agreed that it—

". . . is security not only for the principal indebtedness, in the amount of ($66,000) sixty-six thousand dollars above set forth, but also for any indebtedness of the party of the first part [the Talbots] to the party of the second part [the trust company] during the time that any of the above original indebtedness, or the interest, charges or fees thereon, shall remain unpaid. . . ."

If the trust company owned the note in question it was secured by this mortgage—indeed, it is not seriously contended to the contrary. In effect it is conceded the property described in the mortgage was ample in value to secure this note, in addition to the $66,000 principal debt described in the mortgage. A second mortgage for $25,000 was placed on the property in the latter part of December, 1926, and the property was sold to the second mortgagee about April, 1927, for $165,000, which was more than enough to pay all liens against it. Since plaintiff had guaranteed to pay this note to the trust company only in the event the property mortgaged was insufficient to pay it and prior liens, the circumstance never arose which made the guarantee effective. The trust company released its mortgage without requiring the payment of the note in question. As to this plaintiff, the trust company had no legal right to do so and then to claim the note was his, and that his securities belonged to it. The trust company's excuse for doing so was that about the time they sold the property the Talbots went to the trust company and made some contention that they did not owe the debt represented by the note; or, if they did, it was not properly secured by the mortgage, and had their attorneys threaten the trust company with damages for failure to release the mortgage. Plaintiff's guarantee to the trust company would have protected it in any controversy of that character, and the trust company was not justified in releasing the mortgage without a contest, if necessary, with the Talbots. Their somewhat feeble claim that they did not owe this debt was decided adversely to them by the previous decision of this court (128 Kan. 180, 276 Pac. 808), and again by the trial court in this last trial. If they owed the note, and the trust company owned it, their contention that it was not secured by the mortgage had no force.

The result is the trust company has no right to withhold from plaintiff his securities.

By cross petition the trust company sought to recover from plain-

tiff various items of expense it has been to in this litigation, including attorneys' fee, on the ground plaintiff had guaranteed its expenses, and recovered a judgment for $7,456.11. Appellant complains of this. It is erroneous. Plaintiff guaranteed the expenses of the trust company in having this note paid from the mortgaged property. It does not appear that any of the expense charged in the cross petition was for that purpose. Plaintiff never agreed to pay expenses made by the trust company in fighting him, and a judgment therefor cannot stand.

Among other things the trust company, in its brief in this court, says:

"The appellant correctly states, in general, what the law would have been had the trust company been the purchaser of the note in question, and Claude Hamilton the guarantor thereof, and had said note been secured by the Lyon county mortgage,"

but argues that since the trial court found against plaintiff on those questions the contentions of appellant cannot be sustained.

The trial court made numerous findings in this case. We have not attempted to follow them *seriatum*. As previously stated, the one controlling controverted question in this case was whether plaintiff sold the note to the trust company. We have determined that question contrary to the findings of the trial court. It necessarily follows that all findings and conclusions of law made by the trial court adverse to the plaintiff must be and are hereby set aside. We note the trial court gave plaintiff judgment against the makers of the note in question for the amount thereof with interest. No pleading justified such a judgment, and no one contends it is good. It is hereby set aside.

There has been a substitution of plaintiff in this case by reason of the bankruptcy of Claude Hamilton and of the sale by his trustee in bankruptcy of plaintiff's right of action in this case to Lillian Hills Hamilton, but since it is not contended this substitution makes any difference in the rights of the parties here we have given it no special attention.

The judgment of the court below is reversed, with directions to enter judgment for plaintiff against the trust company for the securities represented by the $15,000 placed by plaintiff with the trust company, with any unpaid interest thereon.

It is so ordered.